ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

FEB 0 7 2006

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| ARGENTO TRADING COMPANY L.P., on behalf of itself and all others similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>COCA-COLA ENTERPRISES, INC. LOWRY F. KLINE , JOHN R. ALM, PATRICK J. MANNELLY, RICK L. ENGUM, E. LISTON BISHOP, III, G. DAVID VAN HOUTEN, JR, SUMMERFIELD K. JOHNSTON, JR.,<br>        Defendants. | CIVIL ACTION FILE NO.<br>**1:06-CV-0275**<br>CLASS ACTION  **TWT**<br><br><br>COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS |

## **CLASS ACTION COMPLAINT FOR SECURITIES FRAUD**

Plaintiff makes the following allegations, except as to allegations specifically pertaining to plaintiff and counsel, based on the facts alleged below that are predicated upon the investigation undertaken by Plaintiff's counsel. That investigation included analysis of publicly-available news articles and reports, public filings, press releases and other matters of public record, and interviews with former employees of Defendants that were employed in positions that they would have reasons to know the

- 1 -

information and allegations attributed to them.

## NATURE OF THE ACTION

1. This is a securities class action seeking remedies for violations of the federal securities laws. The action is brought on behalf of a class consisting of all persons who purchased or otherwise acquired the securities of Coca-Cola Enterprises, Inc. ("CCE" or the "Company") during the period October 15, 2003, through July 28, 2004, inclusive (the "Class" and the "Class Period") for violations of Sections 10 (b), 20 (a) and 20A of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission ("SEC").

2. Defendants' public statements during the Class Period, including statements to investors during earnings conference calls, press releases, and filings with the SEC, were materially false and misleading because they misrepresented the true reasons for the Company's historical financial performance and its ability to meet publicly disseminated projections of future revenues, earnings and growth in the volume of its sales of soft drink products pursuant to its exclusive licensing, trademark and distribution agreements with The Coca Cola Company ("Coke").

3. In particular, Defendants failed to disclose to the marketplace that, in order to achieve CCE's reported financial performance, meet projected earnings

guidance and analyst expectations, and demonstrate continued growth in its sales volume figures – a key industry metric that reflects the level of consumer demand -- CCE had a longstanding, systemic practice of stuffing its retail and reseller channels with its soft drink and beverage products. Such practices, although widely known internally throughout CCE's management ranks, and highly material to the reasons CCE historically meet projected earnings guidance, were never disclosed by the Company.

4.      Rather, Defendants concealed the effects of such practices by routinely explaining shifts in CCE's revenues, earnings, and sales volume figures on the weather, price and cost structure changes, new product introductions, and marketing efforts. While these matters clearly affect revenue, earnings, and sales volumes, Defendants' publicly disclosed explanations of CCE's historical financial results and future prospects were misleading without additional disclosures regarding the Company's channel stuffing activities and how they affected both CCE's historical financial results and its future prospects.

5.      Defendants' channel stuffing scheme also caused CCE to improperly recognize revenue in violation of Generally Accepted Accounting Principles ("GAAP"), which in turn artificially inflated CCE's publicly reported financial

condition. Consequently, Defendants' representations during the Class Period that CCE's financial statements complied with GAAP also were materially false and misleading.

6.     On July 29, 2004, Defendants disclosed that CCE would not meet its previously estimated earnings guidance for 2004, due primarily to declines in its North American and European sales volumes. However, rather than reveal the primary underlying cause of those volume declines, Defendants returned to their tried and true explanations, in particular, the "weather." Although the weather may have played some role, Defendants did not disclose – nor have they ever disclosed – that a proximate cause of the decline was Defendants' channel stuffing scheme.

7.     In advance of this disclosure and while CCE's stock price was artificially inflated, CCE's Chairman, Summerfield Johnston Jr., the grandson of the founder of Coke, sold over $172 million of his personal holdings of CCE stock, concluding his insider selling activities on July 28, 2004, the day before the Company issued a corrective earnings announcement that resulted in a nearly 25% drop in CCE's stock price in a single day. At the time of Johnston's insider stock sales he had knowledge of Defendants' channel stuffing activities and accounting manipulation. Defendant Johnston's stock sales were both suspicious in timing and amount. Similarly, other

- 4 -

insider Defendants in possession of non-public information sold substantial amounts of their CCE stock during the Class Period that were suspicious in both timing and amount.

8. Reacting to both Defendants' disclosures and their insider trading activity, investors pummeled CCE's stock price to a single day, 25% decline, on record trading volume of 18,573,800 shares. At the close of business on July 28, 2004, the last day of the Class Period, CCE's stock price was $25.03 per share. At the close of business on July 29, 2004, after Defendants' disclosures, CCE's stock price fell precipitously to $20.63, erasing nearly a quarter of CCE's then $12.5 billion market capitalization.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1337 and 1367, Section 27 of the Exchange Act, 15 U.S.C. §78aa, and Section 22 of the Securities Act, 15 U.S.C. § 77v.

10. Venue is proper in this district pursuant to Section 27 of the Exchange Act, Section 22 of the Securities Act, and 28 U.S.C. § 1391(b) and (c). Substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this district and CCE maintains its principal executive offices in this district.

11. In connection with the acts and omissions alleged in this complaint,

Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

12. Plaintiff Argento Trading Company L.P., a limited partnership with its principal place of business in New York, NY, purchased CCE common stock during the Class Period, as set forth in the accompanying certification, which is incorporated herein by reference, and was damaged thereby.

13. Defendant CCE is a corporation organized and existing under the laws of the state of Delaware and maintains its principal executive offices at 2500 Windy Ridge Parkway, Atlanta, GA 30339. CCE is the world's largest marketer, producer, and distributor of products of The Coca-Cola Company ("Coke"). The Company currently distributes approximately 4.4 billion unit cases (24 eight-ounce servings, or 192 ounces per case) of products in bottle, can, and fountain containers, or 2.0 billion physical cases, on an annual basis. This represents approximately 21 percent of Coke's worldwide beverage sales volume. CCE operates in parts of 46 states in the United States, all 10 provinces in Canada, and portions of Europe including Belgium, continental France, Great Britain, Luxembourg, Monaco, and the Netherlands. The

Company initially offered its stock to the public on November 21, 1986, and is listed on the New York Stock Exchange under the symbol "CCE."

14.     Defendant Lowry F. Kline ("Kline") has served as CCE's Chairman of the Board of Directors from April 2002 to present and was Chief Executive Officer of the Company from April 2001 until January 2004. He was Vice Chairman of the Board from April 2000 to April 2002. Prior to that he had been Executive Vice President and Chief Administrative Officer from April 1999 to April 2000. He was Executive Vice President and General Counsel from October 1997 until July 1999. Kline has been a member of CCE's board since 2000.

15.     Defendant John R. Alm ("Alm") was elected Chief Executive Officer of the Company on December 16, 2003, and continues to serve in that capacity. Alm has served as the Company's President since January 2000. Before that, he had been Chief Operating Officer since October 1999, and prior to that, he had served in various roles including Principal Operating Officer and Chief Financial Officer. In his role as the Company's highest officer, Alm signed several of the SEC filings at issue in this case. He also certified CCE's financial statements pursuant to the Sarbanes-Oxley Act of 2002. Alm was a participant in the incentive compensation plan as described above.

16.     Defendant Patrick J. Mannelly ("Mannelly") served as the Company's

Chief Financial Officer throughout the Class Period. In his role as the Company's CFO, Mannelly signed several of the SEC filings at issue in this case. He also certified CCE's financial statements pursuant to the Sarbanes-Oxley Act of 2002. Mannelly was a participant in the incentive compensation plan as described above.

17. Defendant Rick L. Engum ("Engum") served as the Company's Vice President, Controller, and Principal Accounting Officer from prior to the beginning of the Class Period until July 2004. In his role as the Company's Principal Accounting Officer, Engum signed several of the SEC filings at issue in this case. Engum was a participant in the incentive compensation plan as described above.

18. Defendant E. Liston Bishop, III ("Bishop") served as the Company's Vice President, Secretary, and Deputy General Counsel during the Class Period. In this role, Bishop signed several of the SEC filings at issue in this case. Bishop was a participant in the incentive compensation plan as described above.

19. Defendant G. David Van Houten, Jr. ("Van Houten") served as CCE's Executive Vice President, Chief Operating Officer and President, North American Business Unit throughout the Class Period. In this role, Van Houten made several of the misstatements at issue in this case.

20. Defendants Kline, Alm, Mannelly, Engum, Bishop and Van Houten are

herein collectively referred to as the "Officer Defendants."

21.     Defendant Summerfield K. Johnston, Jr. ("Johnston") served as a member of CCE's Board of Directors throughout the Class Period. He served as Chairman of the Board's Executive Committee from April 2002.  The Executive Committee exercises powers of the board of directors between meetings, except for amending the bylaws or approving or recommending to shareholders any action or matter that under the Delaware General Corporation Law requires shareholder approval. Johnston also served as the Company's Chief Executive Officer from December 1991 until April 1998 and again from January 2000 through April 2001.  During 2003 CCE paid Defendant Johnston approximately $115,000 in rental and associated charges for use of certain equipment and facilities owned by him, and $650,000 under the terms of a consulting agreement.  In connection with that agreement, Johnston remained fully informed about the daily operational activities of the Company.

22.     The Officer Defendants and Defendant Johnston, by way of their positions as senior executives and/or members of the Board of Directors, had the power, and exercised same, to cause CCE to engage in the wrongful acts and practices complained of herein.   The Officer Defendants and Defendant Johnston were, therefore, "control persons" of CCE within the meaning of Section 20(a) of the

Securities Exchange Act.

23. It is appropriate to treat the Officer Defendants and Defendant Johnston as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the Officer Defendants and Defendant Johnston, by virtue of his high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest level and was privy to confidential proprietary information concerning the Company and its business, operations, prospects, growth, finances, and financial condition as alleged herein.

24. The Officer Defendants and Defendant Johnston were involved in drafting, producing, reviewing, approving and/or disseminating the materially false and misleading statements and information alleged herein, including SEC filings, press releases, and other publications, were aware of or recklessly disregarded that materially false or misleading statements were being issued and/or omitted regarding the Company, and approved or ratified these statements and/or omissions in violation of the federal securities laws.

25.    As officers, directors, and controlling persons of a publicly held company whose common stock was, and is, registered with the SEC, traded on the NYSE, and governed by the provisions of the federal securities laws, the Officer Defendants and Defendant Johnston each had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, earnings, management, and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Officer Defendants' and Defendant Johnston's misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

26.    The Officer Defendants and Defendant Johnston participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or with severe recklessness disregarded, the misstatements contained therein and the omissions therefrom, and were aware of, or with severe recklessness disregarded, the materially false and misleading nature thereof. Because of their positions with CCE, each of the Officer Defendants and Defendant Johnston had access to adverse

undisclosed information about CCE's business prospects, financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about CCE and its business, issued or adopted by the Company, materially false and misleading.

27.     Each of the Officer Defendants and Defendant Johnston is liable as a participant in the fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of CCE's securities, by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding CCE's business, its finances, the reasons for its earnings and revenue, and the Company's intrinsic value; and (ii) caused Plaintiff and other members of the Class to purchase CCE securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

28.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all purchasers of securities issued by or on behalf of CCE through and including October 15, 2003, and July 28, 2004, inclusive (the Class Period). Excluded from the Class are the individual Defendants, members of the immediate family of each of the individual Defendants, any subsidiary or affiliate of CCE and/or Coke, and the directors and officers of CCE

and/or Coke or their subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

29.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members of the Class located throughout the United States. As of October 25, 2005, there were reportedly more than 473,513,586 million shares of CCE common stock outstanding. Throughout the Class Period, CCE common stock was actively traded on the New York Stock Exchange under the symbol "CCE." Record owners and other members of the Class may be identified from records maintained by CCE and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

30.    Plaintiff's claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law and state law that is complained of herein.

31.    Plaintiff will fairly and adequately protect the interests of the members of

the Class and have retained counsel competent and experienced in class and securities

litigation.

32.    Common questions of law and fact exist as to all members of the Class

and predominate over any questions solely affecting individual members of the Class.

Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

- whether Defendants participated in and pursued the common course of conduct complained of herein;

- whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of CCE;

- whether statements made by Defendants to the investing public during the Class Period, including statements within the Registration Statement/Prospectus, misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of CCE;

- whether the market price of CCE common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

- to what extent the members of the Class have sustained damages and the proper measure of damages.

33.    A class action is superior to all other available methods for the fair and

efficient adjudication of this controversy since joinder of all members is impracticable.

Furthermore, as the damages suffered by individual Class members may be relatively

small, the expense and burden of individual litigation make it impossible for members

of the Class to individually redress the wrongs done to them.    There will be no

difficulty in the management of this suit as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

34.    At all relevant times, the market for CCE common stock was an efficient

market for the following reasons, among others:

- CCE common stock met the requirements for listing, and was listed and actively traded, on the New York Stock Exchange, a highly efficient market under the symbol CCE.

- As a regulated issuer, CCE filed periodic public reports with the SEC and the NASD.

- CCE stock was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

- CCE regularly issued press releases which were carried by national newswires. Each of these releases was publicly available and entered the public marketplace.

- The market for CCE's common stock was open, well-developed

> and efficient at all relevant times. The market for CCE securities
> promptly digested current information with respect to CCE from
> all publicly-available sources and reflected such information in
> the price of CCE's securities.

35.     As a result of Defendants' materially false and misleading statements and

failures to disclose, CCE common securities traded at artificially inflated prices during

the Class Period.

36.     Plaintiff and other members of the Class purchased or otherwise acquired

CCE securities relying upon the integrity of the market price of CCE securities and

market information relating to CCE and have been damaged thereby. Under these

circumstances, all purchasers of CCE securities during the Class Period suffered

similar injury through their purchase of securities at artificially inflated prices.

Therefore, the presumption of reliance applies.

## DEFENDANTS' SCHEME

37.     Defendants engaged in a fraudulent scheme to artificially increase CCE's

stock price through a series of misrepresentations and omissions relating to the reasons

for the Company's reported sales revenue figures, earnings, financial condition, and

future prospects. In particular, Defendants misrepresented the true reasons for CCE's

sales figures, reported earnings, financial condition and future prospects by concealing

the Company's routine, systematic and widespread channel stuffing practices that

artificially increased reported sales volumes, revenue, earnings. While CCE's stock price was artificially high, because of Defendants' misleading statements and omissions, Defendants profited from that price inflation through their illegal insider trading activities and the Company's incentive compensation plans.

38.    One of the key metrics of the soft-drink beverage industry is the volume of product sold, measured in case sales of finished or bottled product. CCE's reported sales volume figures provide an indication to investors of, among other things: (1) intrinsic consumer demand for CCE's products; (2) prospects for future growth in that demand and, thus, prospects for future growth in CCE's sales revenue; and (3) CCE's relative market strength when compared to its competitors. Consequently, Defendants have strong reasons to maximize CCE's reported sales volume.

39.    In addition, because increased sales volume also translates into increased sales revenue, it is in CCE's legitimate business interest to maximize the volume of its product sales at profitable levels and to properly account for the revenue derived from those sales. As a result, public reports by CCE of changes in it key sales volume metric directly impacts the price of its securities as investors' demand for those securities change.

40.    To maintain the appearance of growth and profitability, CCE routinely

stuffed its finished soft drink and beverage product into the sales channels of its retailer and reseller customers in order to meet the Company's internally planned soft drink and beverage sales volume figures, as well as revenue and earnings targets, and publicly stated future earnings guidance. CCE's channel stuffing practice pushed excess products onto customers through a variety of mechanisms including: (1) advance warnings of future price increases; (2) price discounts for accepting extra product volume beyond the customers' immediate needs; (3) delivering more product than the customer requested; (4) providing various cash incentives to customers termed as "marketing allowances"; (6) providing non-cash incentives to customers ranging from tickets to sporting events, signed sports memorabilia, and Coca-Cola trademarked items; (7) "park and hold" strategies whereby CCE delivered large shipments of product – usually tractor trailer loads – to customers, leaving the trailers in the parking lot; and (8) granting customers the right to return expired or unsellable product.

41.     CCE's targets for such sales tactics ran the full gamut of the Company's customer base including: (1) "Supers" and "Hypers" -- retail grocery store outlets like King Soopers, Safeway, Krogers, Pathmark, Albertsons, and Vons; (2) "C&Ps" -- convenience stores like 7-Eleven and gas station retail stores like Exxon and BP; (3) "Clubs" – club style retail stores such as Sam's Club and Costco; (4) "Drugs" – drug

stores such as Walgreens and Eckard's; (5) "Mass" – large multi-department stores such as Wal*Mart and Target; (6) "Wholesale" – wholesale vendors that re-sell the product in vending equipment, such as Vend One; and (7) "Full Service" – CCE employees that deliver, stock and fill vending machines. Indeed, as confirmed by numerous former managers and employees of CCE employed at the Company during the Class Period in positions having responsibility for and direct knowledge of the Company's sales, business planning, inventory and distribution systems, CCE's channel stuffing activity was a routine, widespread, and planned-for business practice.

42.    Defendants' failure to disclose CCE's channel stuffing activities and its contribution to the Company's reported sales volume figures, revenue, earnings and future prospects, was a material omission making Defendants' statements during the Class Period about the reasons for CCE's sales volume levels and growth, revenue, earnings and future prospects materially false and misleading. Defendants' channel stuffing scheme also caused CCE to improperly recognize revenue in violation of Generally Accepted Accounting Principles ("GAAP"), which in turn artificially inflated CCE's publicly reported financial condition.

## MATERIALLY FALSE AND MISLEADING STATEMENTS

43.     On October 15, 2003, Defendants announced CCE's third quarter 2003

financial results in a CCE press release issued that day:

> [N]et income applicable to common shareowners [was] . . . $259 million,
> or 56 cents per diluted common share, including the net benefit of 1 cent
> per share from tax items. . . . [F]or the first nine months of 2003, net
> income totaled $545 million, or $1.19 per diluted common share. . . .
> 2003 results compared to third-quarter 2002 net income applicable to
> common shareowners of $190 million, or 42 cents per diluted common
> share, and $414 million or 91 cents per share for the first nine months of
> 2002.

44.     Explaining the reasons for these results, CCE's October 15, 2003, press

release stated in part:

> "Our third-quarter results reflect our unwavering commitment to North
> American and European pricing improvement and our ability to
> successfully manage growth in operating expenses," said Lowry F. Kline,
> chairman and chief executive officer. "Based on our strong third quarter
> performance, which includes the continued benefits of favorable interest
> rates and currency translations, we have now increased our expectations
> for reported 2003 earnings per share to a range of $1.31 to $1.33."
>
> Consolidated physical case bottle and can volume increased 2½ percent
> on a comparable* basis for the third quarter, and 2 percent for the first
> nine months. North American volume grew ½ percent in the third quarter
> partly due to strong sales of Dasani, growth in diet brands, including diet
> Vanilla Coke, and lemon-lime category growth from the introduction of
> Sprite Remix. This offset slower sales of flavored drinks, and the
> extraordinary volume generated by the introduction of Vanilla Coke in
> 2002. In Europe, record-setting hot weather for much of the quarter,
> coupled with the success of new brand introductions and local marketing
> programs, resulted in a 10 percent volume increase during the third
> quarter. For the year, Europe's volume has grown more than 7½ percent.
> We estimate approximately 2 percent of Europe's year-to-date growth is
> attributable to this summer's heat.

45.     CCE's October 15 press release was attached to the Company's Form 8-K

filed with the SEC on October 17, 2003. Defendant Bishop signed the Form 8-K.

46.     In CCE's accompanying October 15, 2003 earnings conference call,

Defendant Alm stated in his opening remarks:

> [W]e achieved very solid profit growth in the third quarter through a combination of consistent pricing initiatives, cost control, and very strong operating performance in our European territory. . . .
>
> Based on the first nine months of this year, we are raising our full-year EPS forecast to a range of $1.31 to $1.33. . . .
>
> We now expect our operating income for the year to be in the range of $1.46 billion to $1.48 billion. . . . The critical factors behind our performance have been our strong commitment to revenue management and our work to control our costs and operating expenses. . . .
>
> Now looking at our quarterly volume performance, third quarter volume in North America slightly exceeded our expectations and ended the quarter up approximately .5% while Europe volume grew 10% aided significantly by what was the warmest summer in recent history in Europe. North America volume growth was .5% for the first nine months in part due to lapping the extraordinary volume generated with the introduction of Vanilla Coke and the strong performance of our Minute Maid portfolio a year ago.
>
> Our volume in Europe certainly was helped by the incredibly hot summer throughout the region, as the weather turned what would have been a solid quarter into an extraordinary quarter. With the introduction of new product initiatives such as Vanilla Coke, Diet Vanilla Coke, and Coke Light with Lemon, and with the continued growth of existing brands, we were well-positioned for good volume growth in the third quarter in Europe exclusive of the weather benefits.

It is important to note the contribution of our existing brands to our third quarter volume growth in Europe, also. Brand Coca-Cola grew 4%, generating more case growth than the total volume for Vanilla Coke in Europe. Diet Coke and Coke Light grew approximately 10%. And Fanta, our third largest brand in Europe, grew more than 11% in the quarter on top of substantial growth in 2002. Fourth quarter volume in Europe will likely be flat with core brand growth offset by our planned de-emphasis of some lower margin promotional volume that we realized in the fourth quarter of the prior year. We continue to expect full-year European volume growth of approximately 5% to 6%.

47.     In the same October 15, 2003 earnings conference call, Defendant

Mannelly stated in his opening remarks:

[W]e have raised our earnings guidance for the full year to a range of $1.31 to $1.33 per share, which includes 3 cents of favorable items mentioned in the release. Accordingly, we expect fourth quarter operations to generate earnings of 12 to 14 cents per share.

Additionally, we expect fourth quarter operations to generate operating profit equal to or slightly below prior year, due to flat volume in both Europe and North America as well as the recognition of SGI funding for the quarter below prior year amounts. Last quarter we forecasted our SGI-related funding from the Coca-Cola Company to be approximately $40 million below planned levels due to lower volume growth in North America.

Our funding has been consistent each quarter this year as we benefited from carry-over volume as well as strong results in Europe. However, expected flat volume in North America and Europe for the fourth quarter will result in fourth quarter funding below prior year levels and negatively impact our fourth quarter operating results comparison.

As John mentioned, our full-year operating income results are expected to total approximately $1.46 to $1.48 billion, up 7 to 9% versus prior year.

48.    Emphasizing the importance of Coke's SGI payments, Defendant

Mannelly later commented:

> with regards to the financial aspects of the fourth quarter, our operating results in the fourth quarter are really being affected. The growth rate is being affected by the reduction in SGI funding. So that's the primary reason why operating results appear to be forecasted as flat.

49.    In response to a question from Caroline Levy, an analyst with UBS

Warburg, regarding the reasons for declining volumes in North America, Defendant

Van Houten explained:

> I think the whole country was somewhat affected in the first half of the year with unseasonably cooler and wet weather. I think that we did see some improvement in most parts in the second half of the summer, but -- and then with the -- hopefully the economy improving and just business conditions in general improving will -- you would think that the whole industry would benefit from that.

50.    Finally, in response to a question from Art Cecil, an analyst from T. Rowe

Price, regarding CCE's full year 2003 earnings guidance and the effect on it from

Defendants' favorable weather claims, Scott Anthony, CCE's Vice President of

Investor Relations stated "Primarily they've been eaten up by North America

underperforming where we thought they would be early in the year."

> CCE filed its third quarter 2003 Form 10-Q with the SEC on October 31, 2003. It repeated the financial information disclosed in CCE's October 15, 2003 press release and the accompanying earnings conference call.

51.    Discussing CCE's results from operations, the third quarter 10-Q

provided, in part:

> Our operating results in the third quarter of 2003 reflect continued strong year-over-year growth in Europe partially because of favorable weather conditions, meaningful pricing initiatives in North America and Europe, and moderating operating expense trends in North America. Third quarter 2003 currency-neutral bottle and can net price per case increased 1 1/2 % in North America and 3 1/2 % in Europe over the same period last year.
>
> For the third quarter of 2003, net income applicable to common shareowners increased to $259 million, or $0.56 per diluted common share, including a $0.01 per share net benefit from the favorable resolution of tax items. This represents an increase of approximately 36% over net income applicable to common shareowners of $190 million for the same quarter last year. Operating income increased 19% over third quarter 2002 results to $524 million for third quarter 2003, impacted by strong growth in our European operations, favorable pricing results in both North America and Europe, and our ability to successfully manage operating expenses.
>
> . . . .
>
> Net Operating Revenues
>
> Our third quarter 2003 net operating revenues increased 9% to $4.7 billion. This increase was primarily a result of favorable currency exchange rate movement (4%), an increase in pricing (2 1/2%), and improved volume (2 1/2%). For the first nine months of 2003, the percentage of consolidated net operating revenues derived from our North American and European groups was 72% and 28%, respectively. . . .

52.    As to sales volumes, the third quarter 2003 Form 10-Q stated:

> Consolidated comparable bottle and can volume for the third quarter of 2003 increased 2 1/2% over the same quarter last year. Volume in North America was up 1/2%. Strong sales of Dasani, solid growth in our diet portfolio, and growth in our lemon-lime category from the introduction of

Sprite Remix were offset by slower sales of flavored drinks and overcoming the extraordinary volume generated by the introduction of Vanilla Coke in 2002. Strong volume increases in Belgium, Great Britain, and France contributed to comparable volume growth in Europe of 10%.

In North America, we continued to work through the hurdle of 2002 volume growth created by strong Minute Maid performance and by the introduction of Vanilla Coke. We benefited from very strong North American diet soft drink growth of 8% in the quarter, with improvement from diet Coke, up 5%, diet Cherry Coke, with volume more than double versus a year ago, and from diet Vanilla Coke, which has performed very steadily since its introduction in late 2002. In flavored soft drinks, Sprite Remix has proven a solid addition to our portfolio, with more than a third of its volume in our 20-ounce package. In packaging, we are expanding our distribution of 6-pack 24-ounce carbonated soft drink products with good consumer response. We are also steadily moving forward with the implementation of Fridge Pack throughout North America, which is now available in markets constituting more than 75% of our volume. Full-year North American volume is expected to remain essentially flat.

. . . .

Third quarter 2003 European volume benefited from favorable weather for much of the quarter, success from the introductions of Vanilla Coke and diet Vanilla Coke and the success of local marketing programs. Carbonated soft drink volume for third quarter 2003 in Europe increased approximately 9% over third quarter 2002, with brand Coca-Cola growing 4%, diet Coke and Coca-Cola light growing approximately 10%, and Fanta, our third largest brand in Europe growing more than 11% on top of substantial growth in 2002. European volume is expected to grow 5% to 6% for full year 2003.

53.    Defendants Mannelly and Engum signed the third quarter 2003 Form 10-

Q and Defendants Klein and Mannelly certified that the statements in CCE's third

quarter 2003 Form 10-Q were true and complied with Sarbanes-Oxley.

54.    CCE issued a press release on December 17, 2003, providing in part:

Management continues to expect approximately flat volume performance in North America for 2003 while achieving growth in Europe of approximately 5 percent for the full year. Reported earnings per diluted common share for the year are expected to total approximately $1.39, including the net effect of insurance proceeds and other items.

. . . .

2004 Outlook

In its outlook for 2004, CCE expects to achieve physical case volume growth in North America of approximately 1½ percent. Management expects enhanced revenue management strategies to produce bottle and can net pricing per case growth in North America through a combination of rate and mix of approximately 2½ percent.

Our European business is expected to remain strong in 2004. While bottle and can net pricing is expected to grow approximately 2 percent, our forecasted volume growth will be approximately 1½ percent. Although this growth is below longterm trends, this outlook primarily reflects our strategic decision to develop a new water portfolio with The Coca-Cola Company. This transition will have a negative impact on volume growth during 2004, but we remain committed to a long-term growth rate of 4 percent to 6 percent.

CCE expects 2004 net income per diluted common share to increase to a range of $1.41 to $1.44. Our underlying operating profit growth rate is expected to reach a high single-digit range in 2004,

. . . .

"Our company will achieve improved financial results in 2003 and we fully intend to build on these results with even better operating performance in 2004," said Lowry F. Kline, chairman and chief executive officer. "Despite challenging operating conditions through much of this year, we made significant financial progress, generating higher free cash flow, a 40 basis point improvement in return on invested capital, and an approximate $400 million reduction in net debt balance."

"Two primary factors for our future success, in North America and Europe, are a clear company focus on revenue management and

continued brand and package development," said John R. Alm, president and chief operating officer. "In North America, we expect continued strength in our diet soft drink brands, water, and juice drinks, while package innovations will add value to our brands.

"Our business plan in Europe includes several excellent products and brand initiatives that, when coupled with plans for solid, creative advertising, will enable us to continue to build a strong European soft drink culture."

55.    CCE's December 17 press release was attached to the Company's Form 8-

K filed with the SEC on December 19, 2003.  Defendant Bishop signed the Form 8-K.

56.    On January 29, 2004, CCE issued a press release reporting that:

fourth-quarter 2003 net income applicable to common shareowners increased to $128 million, or 28 cents per diluted common share. Operating income grew to $346 million in the fourth quarter, up 38 percent versus prior year results.

Full-year 2003 net income totaled $674 million, or $1.46 per diluted common share. Operating income totaled $1,577 million in 2003, an increase of 16 percent.

. . . .

— Comparable fourth-quarter 2003 net income per diluted common share was 17 cents, up 31 percent from comparable prior year results. Full-year 2003 net income per share totaled $1.32, an increase of 28 percent over comparable 2002 results.

— Comparable fourth-quarter 2003 operating income grew 5 percent to $264 million, while full-year 2003 comparable operating income increased 9 percent to $1,487 million.

Our 2003 financial performance reflects strong growth in Europe, consistent pricing initiatives throughout our territories, and favorable foreign currency translations.

. . . .

Consolidated physical case bottle and can volume decreased 1 percent on a comparable basis for the fourth quarter, and increased 1 1/2 percent for full year 2003. North American volume was down approximately 1 percent in the fourth quarter, and flat for the full year. Our full year 2003 volume results in North America were characterized by growth in diet soft drink brands, including diet Vanilla Coke, strong sales of Dasani, and lemon-lime category growth from the introduction of Sprite Remix. This offset slower sales of regular soft drinks and the comparisons resulting from the introduction of regular and diet Vanilla Coke in 2002.

In Europe, volume was down approximately 1 1/2 percent in the fourth quarter as we decreased promotional activity and deemphasized certain low value brands in our portfolio. For the full year, European volume increased 5 1/2 percent reflecting record-setting hot weather during the summer months, the success of local marketing programs, and new brand introductions, including Vanilla Coke and Diet Coke/Coke light with Lemon.

"Our dedication to revenue management was essential to our success for the year, and we will enhance this strategic commitment in 2004," said John R. Alm, president and chief executive officer. "Strong, popular brands, in the right package, make revenue enhancement possible and sustainable through a combination of rate and mix. It is vital that we continue to build our brands with even higher levels of demand creation, innovation and marketplace execution.

"We plan continued product and package development, already demonstrated by the introduction of Diet Coke with Lime, as well as significant brand building activities in support of our existing brands, including the NCAA Final Four and a unique summer initiative," Mr. Alm said. "We believe these efforts will drive growth and increase value in the year ahead, benefiting customers and consumers in North America and Europe."

. . . .

Full-Year 2004 Outlook

Full-year 2004 earnings per diluted common share are now expected in a range of $1.42 to $1.46. 2004 operating profit is expected to increase 5

percent to 6 percent from comparable 2003 operating profit of $1,487 million. 2004 operating income expectations include the impact of a significant increase in pension expense, which will negatively impact 2004 growth by approximately 3 percent. We do not foresee a significant pension expense increase in 2005.

Full-year 2004 physical case bottle and can volume growth is expected to total approximately 1 1/2 percent in both North America and Europe. While expected volume growth in Europe is below our long-term trends, our outlook for 2004 reflects our strategic decision to develop a new water portfolio with The Coca-Cola Company, combined with hurdling the volume generated by last summer's record setting hot weather. We remain committed to a long-term growth rate of 4 percent to 6 percent for our European territories.

57.    CCE's January 29 press release was attached to the Company's Form 8-K

filed with the SEC on January 29, 2004.  Defendant Bishop signed the Form 8-K.

58.    In his opening remarks during the January 29, 2004, earnings conference

call, Defendant Klein stated:

As noted in the release, we achieved excellent full year 2003 financial results, and have now increased our guidance for 2004.

For the full year 2003, our net income totals $674 million, or $1.46 per share -- including the net benefit of favorable items totaling 14 cents per share.

On a comparable basis, our per-share results were up 29 percent and our operating income grew 9 percent to a total of $1.487 billion dollars. . . .

In achieving these performance levels during 2003, we made very significant improvement in three additional key financial measurements -- we've increased our free cash flow by more than $300 million to a total of approximately $700 million. We've reduced our debt balance by approximately $400 million and we improved our return on invested capital by 40 basis points.

Several factors enabled us to achieve these results, including a strong commitment to improve revenue management with North American pricing of 2 percent and European pricing growth of approximately 2.5 percent for the year.

. . . .

Although it proved difficult to grow North American volume, we're still pleased that we were able to outpace the industry, even as cycled the highly successful introduction of regular and diet Vanilla Coke, we dealt with the well-documented external factors that effected the entire industry and we maintained our revenue management initiatives throughout all that.

We believe that we have continued to build strong brand equity and we have positioned ourselves for the resumption of North America volume growth in 2004.

In Europe, product innovation, package innovation, excellent marketing, and a record-setting summer heat, combined -- all combined to create full year 2003 volume growth of 5.5 percent. . . .

Overall, we're very pleased with the ongoing progress that our 2003 results represent. Our goal is the same as it always has been -- building long-term shareholder value. That's a goal we feel like we are accomplishing with consistent profit growth.

Our 2004 guidance calls for volume growth of 1.5 percent in North America and pricing growth of 2.5 percent. When coupled with our continued focus on cost controls and improved efficiency, we believe that we are on track for another year of solid financial performance.

The progress we are making with our joint planning process with the Coca-Cola Co. gives us another source of optimism. At our meeting in December, we summarized the key components of our Company's joint efforts to conduct a full and complete study of the North America system, born out of the recognition that we must identify and ultimately capture all opportunities to both expand topline growth and reduce costs. That