IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

IN RE: COCA-COLA ENTERPRISES
INC. SECURITIES LITIGATION

CIVIL ACTION FILE
NO. 1:06-CV-0275-TWT

ORDER

This is a securities fraud class action. It is before the Court on the Defendants'

Motion to Dismiss [Doc. 53]. For the reasons set forth below, the Defendants' motion

is GRANTED.

I. BACKGROUND

This securities fraud class action is brought by a group of plaintiffs individually

and on behalf of persons who purchased common stock of Defendant Coca-Cola

Enterprises Inc. ("CCE") between October 15, 2003, and July 29, 2004 ("the Class

Period"). The Defendants are CCE, the world's largest bottler of Coca-Cola products,

and several of its officers and directors. The individual CCE Defendants are: (1)

Lowry F. Kline, Chairman of the Board of Directors and Chief Executive Officer from

April 2001 until January 2004; (2) John R. Alm, Chief Executive Officer from January

2004 through the end of the Class Period; (3) Patrick J. Mannelly, Chief Financial

Officer; (4) Rick L. Engum, Vice President, Controller, and Principal Accounting

Officer; (5) E. Liston Bishop III, Vice President, Secretary and Deputy General Counsel; (6) G. David Van Houten, Jr., Executive Vice President, Chief Operating Officer and President of the North American Business Unit; and (7) Summerfield K. Johnston, Jr., a member of the Board of Directors at all relevant times and Chairman of the Board's Executive Committee from April 2002 through the end of the Class Period.

The Plaintiffs contend that the Individual Defendants engaged in a scheme to manipulate CCE's financial results and artificially inflate the value of its stock. Specifically, the Consolidated Complaint alleges that the Defendants engaged in the practice of "channel stuffing," which involved placing excess soft drink inventory into CCE's distribution channels near the end of every quarterly reporting period in order to meet the sales and earnings targets set by its officers.  (Compl., ¶ 3.)  These channel stuffing activities also caused CCE to recognize revenue prematurely and improperly by pulling sales forward into earlier reporting periods.  (Id.)  The Plaintiffs thus allege that the Defendants issued false and misleading statements during the Class Period that improperly recognized revenue in violation of Generally Accepted Accounting Principles ("GAAP") and made estimates as to CCE's expected revenues, earnings, and financial condition that lacked a rational basis.  As a result of the Defendants'

failure to disclose this aggressive channel stuffing activity, CCE's stock allegedly traded at materially inflated prices during the Class Period.

In support of their channel stuffing allegations, the Plaintiffs rely on numerous disclosures made by the Defendants during the Class Period. These disclosures include: (1) quarterly and annual financial reporting documents (Form 10-Q's and Form 8-K's) for the years 2003 and 2004; (2) official statements made by the Defendants directly to the public through press releases; and (3) statements made to various analysts and investment institutions during earnings conference calls that were then reported to the public. Through these different communications, the Defendants provided information to the public about various aspects of CCE's business in North America and Europe including sales volume numbers, earnings per share, operating income, net price per case, and net income. The Plaintiffs contend that these statements "were materially false and misleading because Defendants failed to disclose their channel stuffing activities and the effect of those activities on CCE's sales volumes, revenue, earnings, financial condition and future earnings guidance." (Compl., ¶¶ 76, 88, 105, 118.)[1]

---

[1]The dispute between the parties concerns not the content of these statements, but whether the statements were false because of the underlying channel stuffing activity. Thus, in the interest of brevity, the Court does not list each of the allegedly false statements here.

On July 29, 2004, CCE issued a press release stating that it would not meet its previously estimated earnings, due primarily to declines in its European sales volume. The Defendants maintained that these declines were caused mainly by unseasonably cool, rainy weather. (Compl., ¶ 109.)  In response to this disclosure, CCE's stock took a precipitous drop, falling 22% on July 29, 2004, alone.  On February 7, 2006, the Plaintiffs filed this lawsuit, alleging violations of the Securities Exchange Act ("the Exchange Act"), 15 U.S.C. § 78 *et seq.*[2]  The Defendants have now moved to dismiss these claims.

## II. STANDARD OF REVIEW

### A. Motion to Dismiss Standard

A complaint should be dismissed under Rule 12(b)(6) only where it appears beyond doubt that no set of facts could support the plaintiff's claims for relief.  Fed. R. Civ. P. 12(b)(6); see Conley v. Gibson, 355 U.S. 41, 47 (1957); Linder v. Portocarrero, 963 F.2d 332 (11th Cir. 1992).  In ruling on a motion to dismiss, the court must accept the facts pleaded in the complaint as true and construe them in the light most favorable to the plaintiff.  See Quality Foods de Centro America, S.A. v. Latin American Agribusiness Dev. Corp., S.A., 711 F.2d 989, 994-95 (11th Cir.

---

[2]The Defendants filed a Motion to Dismiss.  The Plaintiffs declined to defend the original Complaint which was dismissed.  The Plaintiffs then filed a Consolidated Class Action Complaint on June 30, 2006.

1983).  Generally, notice pleading is all that is required for a valid complaint.  See

Lombard's, Inc. v. Prince Mfg., Inc., 753 F.2d 974, 975 (11th Cir. 1985), cert. denied,

474 U.S. 1082 (1986).  Under notice pleading, the plaintiff need only give the

defendant fair notice of the plaintiff's claim and the grounds upon which it rests.  Id.

  B. Special Pleading Standard for Securities Fraud

The Plaintiffs allege that the Defendants' channel stuffing activities violated

section 10(b) of the Exchange Act.  This provision makes it unlawful "[t]o use or

employ, in connection with the purchase or sale of any security . . . any manipulative

or deceptive device or contrivance in contravention of such rules and regulations as

the Commission may prescribe."  15 U.S.C. § 78j(b).  Rule 10b-5, promulgated by the

Commission, states:

> It shall be unlawful for any person, directly or indirectly, by use of any
> means or instrumentality of interstate commerce, or of the mails or of
> any facility of any national securities exchange, (a) To employ any
> device, scheme or artifice to defraud, (b) To make any untrue statement
> of a material fact or to omit to state a material fact necessary in order to
> make the statements made, in the light of the circumstances under which
> they were made, not misleading, or (c) To engage in any act, practice, or
> course of business which operates or would operate as a fraud or deceit
> upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  The Eleventh Circuit has held that: "To succeed on a Rule

10b-5 fraud claim, a plaintiff must establish (1) a false statement or omission of

material fact (2) made with scienter (3) upon which the plaintiff justifiably relied (4)

that proximately caused the plaintiff's injury." <u>Robbins v. Koger Properties, Inc.</u>, 116 F.3d 1441, 1447 (11th Cir.1997).

With respect to the false statement and scienter requirements, a federal securities fraud plaintiff must meet certain heightened pleading standards. First, any fraud claim brought in federal court must satisfy the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. Rule 9(b) states that with respect to a claim of fraud, "the circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b). A complaint satisfies this rule if it sets forth precisely (1) what statements or omissions were made in what documents or oral representations, (2) who made the statements, (3) the time and place of the statements, (4) the content of the statements and manner in which they misled the plaintiff, and (5) what benefit the defendant gained as a consequence of the fraud. <u>Brooks v. Blue Cross and Blue Shield of Fl., Inc.</u>, 116 F.3d 1364, 1371 (11th Cir. 1997); <u>In re Theragenics Corp. Securities Litigation</u>, 105 F. Supp. 2d 1342, 1348 (N.D. Ga. 2000). Simply put, this rule requires that a plaintiff plead all the elements of the first paragraph of a newspaper story: "the who, what, when, where and how." <u>Garfield v. NDC Health Corp.</u>, 466 F.3d 1255, 1262 (11th Cir. 2006); <u>In re Scientific-Atlanta, Inc. Securities Litigation</u>, 239 F. Supp. 2d 1351, 1358 (N.D. Ga. 2002).

In 1998, Congress augmented these pleading requirements for private securities fraud class actions by enacting the Private Securities Litigation Reform Act ("the Reform Act"), 15 U.S.C. § 78u-4(b). This statute was "enacted to cure perceived abuses in prosecuting class actions brought pursuant to federal securities laws." In re Scientific-Atlanta, Inc., 239 F. Supp. 2d at 1358. The Reform Act thus supplements Rule 9(b) in two ways. First, the plaintiff must specify "the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The Reform Act further requires that with respect to any claim where recovery is permitted "only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). The application of these provisions will be discussed in further detail below.

### III. DISCUSSION

The Defendants argue that the Consolidated Complaint should be dismissed because: (1) it fails to meet the particularity requirements for pleading a federal securities fraud claim; (2) the Defendants' statements are protected by the Reform

Act's Safe Harbor Provisions, 15 U.S.C. § 78u-5(c)(1)(A) and (c)(1)(B); and (3) it

fails to state a cognizable claim against the Individual Defendants under section 20(a)

of the Exchange Act.[3]  The Court will address each of these claims in turn.

———————————————

[3]The Defendants also claim that the Plaintiffs' allegations are in reality claims of corporate mismanagement and are thus barred by the Supreme Court's decision in Santa Fe Industries, Inc. v. Green, 430 U.S. 462 (1977).  In Sante Fe Industries, the Court considered whether a Rule 10b-5 action could be brought against a corporate entity and its officers for breach of fiduciary duty.  The plaintiffs, who were shareholders in a company that was merging with its parent corporation, were offered a share price for their holdings that was 20% above the stock's appraised value.  The plaintiffs claimed that the parent had breached its fiduciary duty by obtaining a "fraudulent appraisal" and making a stock purchase offer based on that appraisal. The Supreme Court concluded, however, that "Congress by § 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement." Id. at 479.  The Court's discussion centered on the issue of whether a section 10(b) claim could be brought where the complaint failed to allege any manipulation or deception.  The Supreme Court found that it could not.  Specifically, the Court stated:

> Section 10(b)'s general prohibition of practices deemed by the SEC to be 'manipulative' in this technical sense of artificially affecting market activity in order to mislead investors is fully consistent with the fundamental purpose of the 1934 Act "to substitute a philosophy of full disclosure for the philosophy of caveat emptor"... Indeed, nondisclosure is usually essential to the success of a manipulative scheme.  No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices. But we do not think it would have chosen this 'term of art' if it had meant to bring within the scope of § 10(b) instances of corporate mismanagement such as this, in which the essence of the complaint is that shareholders were treated unfairly by a fiduciary.

Id. at 476-77 (citations and punctuation omitted).  Thus, while a claim for breach of fiduciary duty was not actionable under the statute, the Court clearly indicated that a

A. <u>Plaintiffs' Section 10(b) Pleadings</u>

    1. <u>False Statements</u>

The Consolidated Complaint alleges generally that the Defendants falsely represented CCE's volume sales numbers in their public statements because they did not disclose their channel stuffing activities.  As recently explained by the Seventh Circuit, channel stuffing "creates a short-term illusion of increased demand between the time when the company sends the extra product down the line and the time when the distributors return the unwanted excess." <u>Makor Issues & Rights, Ltd. v. Tellabs, Inc.</u>, 437 F.3d 588, 598 (7th Cir. 2006).  While not fraudulent per se, this practice "may amount to fraudulent conduct when it is done to mislead investors." <u>Garfield v. NDC Health Corp.</u>, 466 F.3d 1255, 1262 (11th Cir. 2006).

In their Motion to Dismiss, the Defendants argue that the Plaintiffs have not sufficiently pled any facts demonstrating fraudulent channel stuffing activity.  The Amended Complaint initially alleges that the Defendants created a false appearance that they were generating volume growth through a variety of channel stuffing activities, including:

---

scheme employed to manipulate the price of a company's stock, such as issuing false sales projections and financial statements, would be actionable. Aggressive sales tactics and errors in applying revenue recognition accounting rules that do not result in materially false sales projections or financial statements are not actionable as securities fraud.

> (1) "park and hold" strategies whereby CCE delivered large shipments of product - usually tractor trailer loads - to customers, leaving the trailers in the parking lot; (2) advance warnings of future price increases; (3) price discounts for accepting extra product volume beyond the customers' immediate needs; (4) delivering more product than the customer requested; (5) providing various cash incentives to customers termed as "marketing allowances"; (6) providing non-cash incentives to customers ranging from tickets to sporting events, signed sports memorabilia and Coca-Cola trademarked items; and (7) granting customers the right to return expired or unsellable product.

(Compl., ¶ 53.)

Federal judges have been reluctant to allow such generalized allegations to satisfy the demands of Rule 9(b) and the Reform Act.  Another judge in this district has held:

> In order to satisfy the heightened pleading requirement . . .  Plaintiffs must include allegations of *at least one* specific channel stuffing transaction, including the name of the [customer], the amount of revenue improperly recognized, and when the transaction occurred (noting that identification of the quarter would be sufficient if a specific [customer] is named and a dollar amount given).

Carpenters Health & Welfare Fund v. Coca-Cola Co., 321 F. Supp. 2d 1342, 1349 (N.D. Ga. 2004).  I will not attempt to set forth a laundry list of facts which must be stated to proceed with a channel stuffing claim.  It suffices to say that the plaintiff must state sufficient facts to give the Court confidence that the plaintiff can relate specific transactions to specific misstatements in sales projections or financial statements.  Furthermore, the plaintiff must allege facts that show that the amount of

sales or revenue improperly recognized is material in relation to the size of the company's operations.  See Johnson v. Tellabs, Inc., 262 F. Supp. 2d 937, 949 n.12 (N.D. Ill. 2003) (stating that a plaintiffs' channel stuffing allegations involving returns of "millions" of dollars in a company with fourth quarter sales of more than a billion dollars were not specific enough to meet the materiality pleading requirements).

Here, the Plaintiffs provide several accounts from different employees within CCE in support of their channel stuffing claims.  The Amended Complaint first references the statements of a Cold Drink Account Manager in the Northern United States employed at CCE from October 2002 through April 2005.  He explained that:

> [A]t the end of every month, he along with other Cold Drink Account Managers were ordered by their District Sales Managers to "get their volume numbers" if they were behind in their forecasted sales goals. The Cold Drink Account Manager understood that he was to achieve his targeted sales goals by whatever means possible.  One common practice he described to achieve forecasted sales figures was to "try and drop off extra product" with a customer.  This practice often happened with larger customers such as Wal-Mart, Kroger, and Meijer.  The Cold Drink Account Manager confirmed that "senior management" was well aware of these practices.  In addition, the Cold Drink Account Manager stated that CCE routinely gave credit to customers for returned product, whether or not it had passed its expiration date.  Most customers, approximately "90 to 95%" charged their purchases of CCE products on account with CCE.

(Am. Compl., ¶ 55.)  This allegation fails to meet the particularity requirement for several reasons.  First, it does not allege the quantity of product that was "dropped off," when the product was ordered, or when it was delivered.  More importantly, it

does not allege the amount of revenue that was improperly recognized as a result of these transactions.

The Plaintiffs next cite the statements of a Cold Drink District Sales Manager in the Southern United States who supervised a 12-person cold drink sales force.  He stated generally that there was tremendous stress to meet numbers and that he would sometimes go to customers' stores and see cases of CCE's soft drinks stacked "up fully high to the ceiling."  (Am. Compl., ¶ 56.)  He also provides several instances in which he allegedly witnessed or participated in channel stuffing activities.  First, he describes an event in April 2003 in which he was negotiating with a customer in order to meet a shortfall in his sales projections.  He claims that in order to meet these projections, he was ordered by the facility's cold drink manager to give away 125 free cases of soft drinks to convince the customer to take an 8,000 case order that he did not need.  (Id., ¶ 57.)  This pleading fails to include not only who this customer was, but whether this product was ever returned.  It thus does not provide any indication that the transaction resulted in improperly recognized revenue.  See Johnson, 262 F. Supp. 2d at 950 ("In the business world, there certainly is nothing inherently wrong with offering incentives to customers to purchase products.").

This manager also describes a transaction in July 2003 in which he "observed a 53-foot trailer filled with CCE beverage products in the parking lot of a SuperOne

supermarket with undelivered product" which in his opinion, had "no legitimate business reason" for being there.  (Am. Compl., ¶ 56.)  This is the closest the Plaintiffs come to providing a concrete example of channel stuffing.   Yet although this allegation does provide a date and customer for the alleged channel stuffing activity, it fails to explain whether this product was improperly recognized as revenue. Without such information, this claim is insufficient to demonstrate illegal channel stuffing activity.  Again, channel stuffing is not in itself fraudulent and this practice generally facilitates fraud only when the product is provided to distributors in excess "in order to create a misleading impression in the market of the company's financial health."  <u>Makor</u>, 437 F.3d at 598.

        The Plaintiffs next provide the account of a former Production Planner/Warehouse Manager in CCE's Northern Gulf States Region.  He states that he "personally witnessed large amounts of CCE's beverage products shipped to customers at the end of the month returned to CCE just after the end of the monthly reporting periods."  (Am. Compl., ¶ 60.)  He claims that with the knowledge of his sales manager and regional vice president, "CCE would dispatch as many trucks as they could full of beverage off site until the close of the monthly reporting period, when the trucks would be brought back."  (<u>Id.</u>)  He states that this practice of parking trucks filled with product on the customer's lot late in the month was quite common,

consistent, and "not due to mistaken orders by customers."  As an example, he explained that "you would have 18 truck loads go out" and "three or four loads, each one with around 2000 cases, coming back."  (Id.)  He identified SuperOne Foods, Wal-Mart, Kroger, and Brookshire as CCE customers taking these deliveries.  This statement fails to allege, however, the date of any specific transaction or the amount of revenue that was improperly recognized.

Finally, the Amended Complaint includes the testimony of a Branch Manager in the Midwestern United States who states that he was "'expected' to meet his sales numbers 'at all costs'" and would thus, as a standard practice, rent trucks to store CCE's product for his customers.  (Id., ¶ 61.)  He testifies that CCE would record revenue from these sales regardless of whether the purchased product was delivered or not and that this was his standard practice for Wal-Mart.  This allegation fails to provide any detail, however, regarding when these transactions occurred or the amount of revenue that was involved.

The Court concludes that the Plaintiffs' allegations, even when considered in aggregate, do not satisfy the particularity requirements of Rule 9(b) and the Reform Act.  The crucial element missing from all of these pleadings is any indication of the amount of revenue that was improperly recognized.  Indeed, the only account that even approaches this standard is the Cold Drink District Sales Managers' description

of a tractor trailer parked in the SuperOne lot in July, 2003.  Even assuming that the

Amended Complaint had specifically alleged the amount of revenue improperly

recognized through this transaction, the Plaintiffs would still need to show how one

truck load of Coca-Cola products would constitute a material instance of channel

stuffing in a company that sold two billion cases of beverages in 2003 alone.  (Defs.'

Mot. to Dis., Ex. D.)[4]  See Johnson, 262 F. Supp. 2d at 949 n.12 (finding that a

plaintiffs' channel stuffing allegations of "millions" of dollars of returns in a company

with fourth quarter sales of more than a billion dollars were not specific enough to

meet the materiality pleading requirements).  As explained in In re Spectrum Brands,

Inc., 461 F. Supp. 2d 1297, 1310-11 (N.D. Ga. 2006):

> Plaintiffs do not allege facts sufficient to show whether the alleged
> channel-stuffing practices were widespread or anecdotal, whether they
> involved hundreds rather than millions of dollars worth of product, or
> how the alleged channel-stuffing transactions at the end of the quarters
> differed from sales made at other times during the quarter.

Similarly here, the Plaintiffs have failed to plead their channel stuffing allegations

with the requisite particularity.  Their allegations invite speculation and conjecture

rather than providing any specific examples of widespread channel stuffing activity

---

[4]In assessing a motion to dismiss, a court may take into account matters in the
public record, including documents required to be filed, and actually filed, with the
Securities and Exchange Commission.  Oxford Asset Mgmt., Ltd. v. Jaharis, 297 F.3d
1182, 1188 (11th Cir. 2002).  The Court will thus consider CCE's 2004 Form 10-K,
which the Defendants included in their Motion to Dismiss.

within CCE.  The Court thus finds that these allegations fail to meet the requirements of Rule 9(b) and the Reform Act.

## 2. Sciener

The Defendants also contend that the Plaintiffs have failed to plead the requisite state of mind with sufficient particularity.  The Eleventh Circuit requires a securities fraud plaintiff to plead scienter with particular facts giving rise "to a strong inference that the defendant acted in a severely reckless manner."  Garfield v. NDC Health Corporation, 466 F.3d 1255, 1265 (11th Cir. 2006) (quoting Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1285 (11th Cir. 1999)). The court further explained that:

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

Id.  Facts indicating the scienter "may include the particular times, dates, places, or other details of the alleged fraudulent activity. Although these particulars are not required per se, their absence from the complaint may be 'indicative of the excessive generality of the allegations' supporting scienter."  Orton v. Parametric Technology Corp., 344 F. Supp. 2d 290, 306 (D. Mass. 2004) (quoting Greebel v. FTP Software, Inc., 194 F.3d 185, 203-204 (1st Cir.1999)).  Where a lawsuit involves multiple defendants and multiple allegations, moreover, "scienter must be found with respect

to each defendant and with respect to each alleged violation of the statute." <u>Phillips</u> <u>v. Scientific-Atlanta, Inc.</u>, 374 F.3d 1015, 1017-18 (11th 2004).  However, the Reform Act does permit the aggregation of facts to infer scienter.  <u>Id.</u> at 1017.

Here, the Plaintiffs attempt to plead scienter through a variety of allegations. They contend that the Defendants: (1) were intentionally fraudulent; (2) violated GAAP standards; (3) through their positions as officers or directors, had a knowledge of CCE's core business and received information establishing the falsity of CCE's public statements; (4) had motive and opportunity to commit fraud; (5) engaged in insider trading; and (6) failed to provide a legitimate explanation for CCE's 2004 decline in volume.  Considered both individually and in aggregate, these allegations fail to meet the pleading requirements for scienter.

### a. <u>Intentional Wrongdoing</u>

The Plaintiffs first argue that scienter is demonstrated through their allegations of conscious wrongdoing by the Defendants.  (Pls.' Resp. to Mot. to Dis., at 20.) Conclusory allegations, however, do not satisfy this pleading requirement.  <u>See</u> <u>In re</u> <u>K-tel Intern., Inc. Securities Litigation</u>, 300 F.3d 881, 894 (8th Cir. 2002).  The Plaintiffs must allege with particularity the facts demonstrating the Defendants' intent. <u>In re Sawtek, Inc. Securities Litigation</u>, 2005 WL 2465041, at *8 (M.D. Fla. 2005) (holding that without particularized facts in support, allegations of "a severely

reckless, if not consciously wrong, course of conduct" are insufficient to demonstrate scienter).  The Plaintiffs' bald assertion that the Defendants acted intentionally does not provide the requisite specificity to clear the scienter hurdle.

b. GAAP Violations

The Plaintiffs claim that scienter is demonstrated through the Defendants' alleged violations of GAAP standards.   GAAP violations alone, however, are insufficient to give rise to a strong inference of scienter.  Ziemba v. Cascade Intern., Inc., 256 F.3d 1194, 1208 (11th Cir. 2001).  Moreover, like other allegations, GAAP violations must be pled with particularity.  In re Serologicals Securities Litigation, 2003 WL 24033694, at *9 (N.D. Ga. Feb. 20, 2003) (citing Lovelace v. Software Spectrum Inc., 78 F.3d 1015, 1021 (5th Cir. 1996)).  To meet this standard, the Plaintiffs must point to "particular transactions" and explain why those transactions violated GAAP standards.  Id.  Here the Plaintiffs generally allege that CCE's financial statements during the second half of 2003 and the first half of 2004 violated GAAP because the Defendants improperly recognized sales revenues before legal title transferred to its customers.  All of their GAAP claims thus in essence arise from the same premise: that the Defendants engaged in widespread channel stuffing and failed to disclose it to their investors.  Because the Plaintiffs have failed to adequately plead

their channel stuffing claims, the Court does not find any of these GAAP allegations to be sufficient to raise a strong inference of severe recklessness.

### c. Defendants' Access to Information and Duty to Monitor

The Plaintiffs next contend that the Defendants, "by virtue of their receipt of information reflecting the true facts regarding CCE and its business practices, their control over and/or receipt of CCE's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning CCE [,] were active and culpable participants in the fraudulent scheme alleged herein."  (Am. Compl., ¶ 119.)  Through a program called Margin Minder, the Individual Defendants had the ability to track sales volume. The program "allowed CCE to generate reports on case sales, comparisons to prior year sales and gross profits, which could be customized to generate reports on any aspect of CCE's sales."  (Id., ¶ 120.)  The Plaintiffs thus argue that because the Individual Defendants had access to these internal reports and had a duty to monitor this information, they were reckless in not preventing the channel stuffing scheme from occurring.  Again, as discussed above, the Plaintiffs have failed to plead facts sufficient to demonstrate that the Defendants engaged in channel stuffing.  Moreover, as this Court determined in In re Theragenics Corp. Securities Litigation, 105 F. Supp. 2d 1342, 1361 (N.D. Ga. 2000), it is not enough to make conclusory allegations that

the Defendants had access to the "true facts" in order to demonstrate scienter, particularly where the complaint fails to allege "which defendant knew what, how they knew it, or when." Id. (quoting In re Comshare, Inc. Securities Litigation, 1997 WL 1091468, at *8 (E.D. Mich. Sept. 18, 1997), aff'd, 183 F.3d 542 (6th Cir.1999)); see also Orton, 344 F. Supp. 2d at 306 ("Nor does a vague assertion that a defendant must have known about the fraud by virtue of his position of authority suffice to prove a strong inference of scienter."). Indeed, in the Eleventh Circuit's recent decision in Garfield, the plaintiff attempted to demonstrate scienter by alleging that the defendant executives attended monthly operational meetings to discuss every aspect of the business, "including the aggressive channel stuffing and mounting problems with accounts recevable (sic)." Garfield, 466 F.3d at 1264. The court refused to find a strong inference of scienter, however, because the plaintiff failed to allege "what was said at the meeting, to whom it was said, or in what context." Id. at 1265.

Here, the Plaintiffs similarly fail to allege that any of the Defendants had knowledge as to the channel stuffing. The essence of their allegations is that because of the Defendants' positions and their general duty to monitor the information on Margin Minder, the Defendants must have known about the channel stuffing. The Amended Complaint fails to provide any specific allegations regarding a time, place or manner in which any of the Individual Defendants was specifically informed or

indicated special knowledge as to CCE's channel stuffing activities.  These pleadings are thus insufficient to demonstrate an inference of scienter.

### d. Motive and Opportunity

The Plaintiffs also attempt to demonstrate scienter through a showing that the Individual Defendants had motive and opportunity to engage in this fraudulent channel stuffing scheme.  They first allege that Coke's payments to CCE and the Individual Defendants (through executive compensation) provided them with motive and opportunity to engage in a fraudulent scheme during the Class Period. Specifically, the Amended Complaint pleads that Coke provided payments that CCE depended on "to meet its bottom line."  (Am. Compl., ¶ 124.)  The Plaintiffs further allege that:

> [S]everal specific bonus compensation plans tied directly to CCE's sales volume.  Pursuant to CCE's "Annual Performance-Based Bonus" approved and begun in 2003, CCE's executive officers, including many of the Individual Defendants, received bonus awards ranging from 63.86% to 106.44% of their annual base salaries based, in part, upon CCE's attainment of 98.7% of its budgeted sales volume of CCE's products.

(Am. Compl., ¶ 135.)  Assuming the truth of these allegations, the Plaintiffs have shown that at least some of the Individual Defendants had an economic motive and, as key officers, had the opportunity to engage in fraud.  In the Eleventh Circuit, however, allegations of motive and opportunity, "without more, are not sufficient to

demonstrate the requisite scienter in our Circuit." Bryant, 187 F.3d at 1286; In re Theragenics Corp., 105 F. Supp. 2d at 1347.  This evidence alone thus cannot prove the requisite scienter in a securities fraud action.

e. Insider Trading

The Plaintiffs next allege the requisite scienter is evidenced by the Individual Defendants' insider trading during the Class Period.  To demonstrate the relevance of stock trades to the issue of scienter, a plaintiff "bear[s] the burden of showing that sales by insiders were in fact unusual or suspicious in amount and in timing." Druskin v. Answerthink, Inc., 299 F. Supp. 2d 1307, 1335 (S.D. Fla. 2004); see also In re Theragenics, 105 F. Supp. 2d at 1361 (holding that a failure to demonstrate that stock sales were unusual or out of the ordinary cannot create a strong inference of scienter). Whether such evidence will support an inference that the Defendants engaged in securities fraud, "turns upon (1) the percentage of holdings sold by a defendant, (2) the number of defendants who sold stock, and (3) the difference between stock sales during the relevant time period and prior activity." Id.

Here, the Plaintiffs' allegations fail to demonstrate insider trading.  First, the Amended Complaint makes no allegations regarding the sale of shares during the Class Period by either of CCE's Chief Executive Officers, Alm or Kline.  See Druskin, 299 F. Supp. 2d at 1336 ("The fact that the CEO, who held a significant

amount of shares and who would have been an essential participant in any fraudulent scheme, did not sell stock undermines any suggestion of knowledge on the part of the defendants due to any other claimed inside sells."); accord In re John Alden Financial Corp. Securities Litigation, 249 F. Supp. 2d 1273, 1282 (S.D. Fla. 2003); Chan v. Orthologic Corp., 1998 WL 1018624, at *12 (D. Ariz. Feb. 2, 1998).  Furthermore, the majority of the Individual Defendants either increased or retained their level of ownership of CCE stock during the Class Period.  (Defs.' Mot. to Dis., Ex. G.) Indeed, the only Defendant who decreased his stock ownership during this period, CFO Mannelly, retained approximately 90% of his holdings.  As one court recently held, stock retention of over 80% by a defendant does not demonstrate unusual or suspicious trading under the Reform Act.  In re Prestige Brands Holding, Inc., 2006 WL 2147719, at *6 (S.D.N.Y. July 10, 2006) (citing Acito v. IMCERA Group, Inc., 47 F.3d 47, 54 (2d. Cir. 1995)).  For all these reasons, the Court does not find the Plaintiffs' pleadings to be sufficient to demonstrate scienter.

### f. CCE's Explanation for Volume Decline

The Plaintiffs raise an additional argument in their response to the Defendants' Motion to Dismiss that scienter is demonstrated by the Defendants' "inability to construct a plausible or consistent explanation for CCE's decline in volume," thus evidencing a "consciousness of guilt from which this Court may infer defendants'

wrongful intent."  (Pls.' Resp. to Defs.' Mot. to Dis., at 30-31.)  Specifically, they argue that the Defendants created a cover story of poor weather in Europe that was inconsistent with the disclosures of one of its competitors, Pepsi Bottling Company. The Amended Complaint alleges that Pepsi "issued no public statements to investors that its product sales volume was dependant on the weather."  (Am. Compl., ¶ 115.) Contrary to this assertion, however, Pepsi Bottling Group, Pepsi's largest bottler, specifically noted in its Third Quarter 2004 10-Q Report that its performance in Spain was affected by cooler weather.  (Defs.' Mot. to Dis., Ex. E.)  Its yearly reports also observed that the company's performance could be affected by unfavorable weather conditions.  (Id., Ex. F.)  Because the Plaintiffs' allegations are contradicted by facts in the public record, this claim does not give rise to a strong inference of scienter.

### 3. Loss Causation

To succeed in a Rule 10b-5 fraud claim, a plaintiff must also prove that the defendant's false statement proximately caused his injury.  In a securities fraud case, this requires a showing of both transaction causation and loss causation.  See Robbins v. Koger Properties, Inc., 116 F.3d at 1447.  Transaction causation "is established when the misrepresentations or omissions cause the plaintiff to engage in the transaction in question."  Id. at 1447 (citations and punctuation omitted).  Loss causation, at issue here, requires a plaintiff to show that "the untruth was in some

reasonably direct, or proximate, way responsible for his loss." <u>Robbins</u>, 116 F.3d at 1447; <u>Barr v. Matria Healthcare, Inc.</u>, 324 F. Supp. 2d 1369, 1379-80 (N.D. Ga. 2004).  In other words, the complaint must allege facts sufficient to demonstrate that the defendant's actions were a "significant contributing cause" to the plaintiffs' loss.  <u>Robbins</u>, 116 F.3d at 1447.  As recently held by the Supreme Court, moreover, it is insufficient to plead simply that a company's stock price at the time of purchase was inflated because of the defendant's misrepresentation.  <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336, 340 (2005).

Unlike a pleading of materiality or scienter, however, the pleading standard for loss causation in a securities fraud case does not impose "any special requirement" on the plaintiff.  <u>Dura</u>, 544 U.S. at 346.  As stated by the <u>Dura</u> Court:

> We concede that the Federal Rules of Civil Procedure require only "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. Rule Civ. Proc. 8(a)(2).  And we assume, at least for argument's sake, that neither the Rules nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss.  But, even so, the "short and plain statement" must provide the defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests.

<u>Dura</u>, 544 U.S. at 346.  The majority of courts that have addressed this issue since <u>Dura</u> have thus concluded that, consistent with Rule 8 of the Federal Rules of Civil Procedure, a plaintiff must "provide only a 'short and plain' statement adequate to give defendants 'some indication of the loss and the causal connection that the

plaintiff has in mind.'" In re Immucor Inc. Securities Litigation, 2006 WL 3000133, at *19 (quoting Dura, 544 U.S. at 347); see, e.g., In re Teco Energy, Inc. Securities Litigation, 2006 WL 2884960, at *5 (M.D. Fla. Oct. 10, 2006) ("Loss causation is not subject to the PSLRA's heightened pleading requirement and must only be plead in accordance with Fed. R. Civ. P. 8(a)(2), which requires a 'short and plain statement of the claim showing that the pleader is entitled to relief.'"); Brumbaugh v. Wave Systems Corp., 416 F. Supp. 2d 239, 256 (D. Mass. 2006) ("[I]n light of Dura's acknowledgment that Fed. R. Civ. P. 8(a)(2) applies to the pleading of economic loss and proximate causation, this court must conclude that Plaintiffs have furnished Defendants 'with some indication of [their] loss and the causal connection that [they have] in mind.'"); Ong v. Sears, Roebuck & Co., 2006 WL 2990438, at *12 (N.D. Ill. Oct. 18, 2006) ("As an initial matter, this court concludes that, to the extent Defendants suggest that Dura imposed stricter fact-pleading requirements for the economic loss and causation elements of an action under § 10(b), Defendants are mistaken."); In re CMS Energy Securities Litigation, 403 F. Supp. 2d 625, 629 (E.D. Mich. 2005) ("The Supreme Court's opinion in Dura clearly explains that it does not modify the pleading requirements of Fed. R. Civ. P. 8(a)(2)..."); Stumpf v. Garvey, 2005 WL 2127674, at *12 (D. N.H. Sept. 2, 2005) ("In Dura, the Supreme Court explained that a plaintiff's allegations of loss causation under § 10(b) are only subject

to the pleading standards of Fed. R. Civ. P. 8(a)(2) requiring "a short and plain statement of the claim showing that the pleader is entitled to relief."); but see In re First Union Corp. Securities Litigation, 2006 WL 163616, at *6 (W.D. N.C. Jan. 20, 2006) (holding that "the particularity requirement applies to the loss causation element of a Section 10(b) claim.").[5]

Despite this lower pleading standard, a securities fraud plaintiff must still allege facts sufficient to place the defendants on notice as to the causal connection between the defendants' misrepresentation and the plaintiff's loss.  Where a plaintiff fails to do so, recovery is prohibited.  For example, in Robbins, an investor class brought a securities lawsuit against a corporation, KPI, and its accounting firm, Deloitte & Touche ("Deloitte"), among others.  The plaintiff class, which consisted of investors who had purchased KPI common stock between July 5, 1989, and October 1, 1990,

_____

[5]The Defendants argue, based on the North Carolina District Court's opinion, that the Plaintiffs must plead loss causation with the same particularity required for the other elements of a section 10(b) claim.  The Court does not agree for several reasons.  First, Dura does not explicitly set forth any such requirement and in fact indicates just the opposite.  Furthermore, as demonstrated by the examples listed above, the majority of courts that have addressed this issue since Dura have found that only Rule 8 notice pleading requirements apply to loss causation.  Finally, several previous securities fraud cases have held that proof of loss causation is not an issue that typically should be resolved on a motion to dismiss.  See In re PSS World Medical, Inc. Securities Litigation, 250 F. Supp. 2d 1335, 1351 (M.D. Fla. 2002); In re Rent-Way Securities Litigation, 209 F. Supp. 2d 493, 513 (W.D. Pa. 2002) (emphasizing that the "causation issue becomes most critical at the proof stage").

alleged that because of the defendants' misrepresentations, the investors "suffered damage when they purchased KPI because the price of the stock was 'artificially inflated.'"  Id. at 1445.  At trial, the plaintiffs' expert testified that as a result of a dividend cut on the final day of the Class Period, the plaintiffs had overpaid by $10.05 per share.  The record demonstrated, however, that this dividend cut was the result of KPI's concerns about future financing and was not in any way connected to the company's later discovered accounting errors.  In fact, it was not until 1991 that KPI first issued a corrective disclosure regarding its revenue figures.  Despite this separation between the date of the plaintiffs' alleged loss and the date the misrepresentation was discovered, the jury entered a verdict in the plaintiffs' favor and fixed damages based on the share value approximated by the plaintiffs' expert.

Following an appeal by Deloitte, however, the Eleventh Circuit concluded that because the plaintiffs did not allege–and there was no evidence indicating–that the October 1990 dividend cut was connected to any accounting errors, the plaintiffs had failed to show that Deloitte's misrepresentations "were a substantial cause of the decline in value of plaintiffs' KPI stock."  Id. at 1448-49.  The court thus held that a reasonable jury could not have connected the defendants' misrepresentations "in some reasonably direct, or proximate, way" to the plaintiffs' losses.  Id. at 1449.  The Eleventh Circuit's rejection of the plaintiffs' claims in Robbins thus resulted from the

plaintiffs' failure to plead that their losses were in any way connected to a misrepresentation by the defendants.

The Defendants here argue that the Plaintiffs cannot sufficiently plead loss causation without demonstrating that the stock price declined due to a corrective disclosure or financial restatement.  Indeed, several district courts have concluded that identifying a corrective disclosure is the only way to plead loss causation.  See In re Tyco Intern., Ltd., 236 F.R.D. 62, 70 (D. N.H. 2006); Takara Trust v. Molex, Inc., 429 F. Supp. 2d 960, 966 (N.D. Ill. 2006); In re Initial Public Offering Securities Litigation, 399 F. Supp. 2d 261, 265-66 (S.D.N.Y. 2005).  The Court agrees with the Plaintiffs' contention, however, that the Dura decision did not place any such requirement on securities fraud claimants.  Indeed, although the Supreme Court concluded that the Ninth Circuit's price inflation standard was incorrect, it expressly declined to consider "other proximate cause or loss-related questions."  Dura, 544 U.S. at 346.  Dura thus ruled only that an investor plaintiff is required to allege at least that the company's share price fell significantly after the truth of the misrepresentations or omissions became known.  Id. at 347.  It did not address, however, "what type of events or disclosures may reveal the truth."  In re Bradley Pharmaceuticals, Inc. Securities Litigation, 421 F. Supp. 2d 822, 828 (D. N.J. 2006).

Furthermore, as one commentator recently pointed out, requiring a plaintiff to show a corrective disclosure in order to plead loss causation could have problematic results:

> This is one of the defects in a rule that allows damages only where a corrective disclosure is pleaded ...  It allows the issuer who has perpetrated a fraud to "walk" the stock price down with other bad news--which may or may not permit others to suspect the truth and reduce their expectations for the stock--all the while continuing to conceal the fraud until such point that the market yawns when the truth is ultimately admitted.

Ann Morales Olazábal, <u>Loss Causation in Fraud-on-the-Market Cases Post-Dura Pharmaceuticals</u>, 3 Berkeley Bus. L. J. 337, 369-70 (2006).  Because the Court does not find <u>Dura</u> or <u>Robbins</u> to mandate a corrective disclosure, the Court declines to impose such a requirement on the Plaintiffs here.

The Court thus concludes that the Plaintiffs may meet the pleading requirement for loss causation simply by providing Defendants with "some indication of the loss and the causal connection that the plaintiff has in mind." <u>Dura</u>, 544 U.S. at 347.  The Plaintiffs have not done so here.  The Amended Complaint alleges that the Defendants artificially maintained CCE's stock price during the Class Period by unlawfully concealing material information from the public regarding the reasons why CCE was able to reach its reported sales volumes.  When on July 29, 2004, the Defendants disclosed that CCE would not meet its previously estimated 2004 earnings guidance,

based primarily on declines in European sales, the Plaintiffs allege that "rather than reveal the primary underlying cause of those volume declines, channel stuffing and improper revenue recognition, Defendants blamed the decline on the weather." (Am. Compl., ¶ 155.) They further contend that analysts were skeptical of the Defendants' attribution of CCE's lowered sales volume numbers to the weather and that the market's reaction reflected that skepticism. (Id., ¶ 116.) The Plaintiffs have not, however, stated a nexus between this July 2004 disclosure and CCE's channel stuffing activities.

B. Safe Harbor

The Defendants also contend that some of the Plaintiffs' claims should be dismissed because the statements alleged to be false or misleading were forward-looking statements and thus protected by the Reform Act's Safe Harbor provisions. 15 U.S.C. § 78u-5(c)(1)(A) and (c)(1)(B). Because the Court has decided to grant the Defendants' Motion to Dismiss for the reasons stated above and further to permit the Plaintiffs to amend their complaint, the Court declines to address this claim at this time. See In re Spectrum Brands, Inc., 461 F. Supp. 2d at 1320 n.9 ("This case presents a unique set of challenges in determining issues whose resolution implicates the facts failed to be sufficiently alleged. Determining whether a statement contains sufficiently 'meaningful' cautionary language and is thus entitled to a PSLRA safe

harbor, for example, can be a fact-intensive question inappropriate for decision on the pleadings.").

C. Section 20(a) Claims

Section 20(a) of the Exchange Act extends liability for violations of Rule 10b-5 to the controlling persons in the defendant company. 15 U.S.C. § 78t(a). "To show control person liability under Section 20(a), a plaintiff must allege that: (1) the company violated § 10(b); (2) the defendant had the power to control the general affairs of the company; and (3) the defendant had the power to control the specific corporate policy that resulted in the primary violation." In re Spectrum Brands, Inc., 461 F. Supp. 2d at 1307 (citing Theoharous v. Fong, 256 F.3d 1219, 1227 (11th Cir. 2001)). The Individual Defendants have also moved to dismiss the Plaintiffs' control person claims, alleging that they have failed to plead an underlying violation. In light of the Court's above-stated conclusions, the Court holds that the Plaintiffs' pleadings are insufficient to maintain a section 20(a) claim. Id. at 1297 (citing Theoharous, 256 F.3d at 1227). Accordingly, these claims are also dismissed.

IV. CONCLUSION

For the reasons set forth above, the Defendants' Motion to Dismiss [Doc. 53] is GRANTED. The Plaintiffs are granted leave to file a Second Amended Complaint within 30 days from the docketing of this Order. In filing any further amended

complaint, the Plaintiffs shall provide the Court with a red-lined copy of the Amended

Complaint so that the Court may identify each amendment that is made.

SO ORDERED, this 7 day of February, 2007.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge